MCV

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-16-320

GORDON CHIBROSKI AND ROBIN
CHIBROSKI,

       Plaintiffs

       v.

LANDMARC CONSTRUCTION
SERVICES, LLC,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

DECISION AND JUDGMENT

STATE OF MAINE
Cumberland ss Clerk's Office
12:44 APR 03 2018
PM
RECEIVED

Before the Court is Gordon and Robin Chibroski's (collectively, "Plaintiffs") complaint against Defendant for violations of the Maine Home Construction Contracts Act ("HCCA"), 10 M.R.S.A. § 1486 *et seq.,* and the Unfair Trade Practices Act, ("UTPA"), 5 M.R.S.A. § 205-A *et seq.*, and for fraudulent misrepresentation or, in the alternative, fraudulent concealment. A bench trial was held on this matter on September 28, 2017. The Court makes the following findings and conclusions.

I. Findings of Fact

On or about January 23, 2013, Robin Chibroski ("Robin") contacted Defendant through its President, Marc Gagnon[1], to discuss entering into an agreement for construction services. Plaintiffs' primary project involved the construction of a horse arena, but Plaintiffs also sought to have Defendant perform renovations on Plaintiffs' home located at 81 Nash Road, Windham, Maine. Pertinent to this lawsuit, Defendant agreed to perform work to build an accessory apartment in Plaintiffs' home and to renovate other areas of the residence including the basement, the garage, and a conference room. The accessory apartment was intended to be a

---

[1] Although Mr. Gagnon has not been made a party to this suit in his individual capacity, for simplicity, he will be referred to as "Defendant" throughout this decision. All communications and actions by Defendant were performed through Mr. Gagnon.

Plaintiffs–James Audiffred, Esq.
Defendant–Michael Bosse, Esq.

rental unit. The parties agreed that work on the interior of the home would begin the week of March 4, 2013. Throughout the discussions with Plaintiffs, Defendant reassured Plaintiffs he was working on the building permit application for the accessory apartment.

On February 11, 2013, Defendant notified Plaintiffs that the permit application had been submitted. That same day, Defendant emailed the town inspector and his administrative assistant to attempt to set a meeting to discuss the permit application. After receiving no response, Defendant emailed the inspector and the administrative assistant against on February 18, 2013. On February 25, 2013, Defendant and Robin met with the director of Windham Code Enforcement, Heather McNally.

On March 4, 2013, Defendant told Plaintiffs he would submit to the Town a revised permit application to incorporate a redesigned septic system for the accessory apartment. Defendant sent the revised application to Heather McNally on March 12, 2013. On March 13, 2013, Robin acknowledged in an email to Defendant that the permit application was still pending. On April 29, 2013, Defendant noted to the Town administrative assistant that he was still waiting on the accessory apartment permit. By email to Defendant dated April 30, 2013, Heather McNally raised several concerns about the accessory apartment and advised Defendant that although the apartment had already been constructed, it still required permits and inspections as well as a certificate of occupancy.

The record shows the initial building permit application was received by the Town of Windham on February 11, 2013. It was signed by Mr. Gagnon as the authorized agent of the property owner. The permit application was never approved. The February 11 application contains a notation stating "not permitted per Heather 10/21/14." (Pl.'s Ex. J.)

On May 3, 2013, Plaintiffs signed a written contract with Defendant for construction of the horse arena. The work on Plaintiffs' residence was referenced in this contract as "Changer [*sic*] order #001" and valued at $3,982.00. Change order #001 was attached to the contract and contains a breakdown of the hours of work performed on the residence between the dates of March 7 and April 15, with a note that the only remaining item was to insulate the garage. Robin gave Defendant a check dated April 19, 2013 in the amount of $3,982.00. The memo reads "81 Nash Road Interior Work."

On June 7, 2013, Defendant sent Plaintiffs a second change order for the insulation of the garage and miscellaneous labor on the residence, valued at $1,069.00. After receiving this change order, Robin questioned Defendant as to what the $3,982.00 represents and why the garage insulation was going to cost twice what Robin expected. Defendant explained that the $3,982.00 was the first payment for all of the interior work and that the cost of the garage insulation included both materials and labor. Robin indicated that she understood the interior work to be a separate invoice and did not understand why it was a part of the larger contract. Defendant replied that Plaintiffs' project "is all one project and job number to us so the interior work that was not part of the arena was above and beyond and I showed it as a change order to my contract with you." (Def.'s Ex. 4.)

On August 17, 2016, Plaintiffs filed a complaint in this Court, alleging violations of the HCCA as well as fraudulent misrepresentation or, in the alternative, fraudulent inducement. On November 16, 2016, Plaintiffs received a notice of violation from the Town of Windham stating Plaintiffs did not have a required building permit for their property. Plaintiffs thereafter amended their complaint on January 30, 2017 to add a claim under the UTPA.

II. Discussion

## A. Home Construction Contracts Act

The HCCA states requires "[a]ny home construction contract for more than $3,000 in materials or labor" to be in writing and signed by both the home construction contractor and the homeowner. 10 M.R.S.A. § 1487. Both parties "must receive a copy of the executed contract prior to any work performance. This basic contract must contain the entire agreement between the homeowner ... and the home construction contractor and must contain" a number of contractual terms detailed in the statute. *Id.*

Plaintiffs argue that the agreement that Defendant would perform work on Plaintiffs' residence to construct an accessory apartment falls within the purview of the HCCA. Plaintiffs contend Defendant violated the HCCA by performing under a verbal home construction contract for more than $3,000, rather than having a written contract incorporating the terms required by the HCCA. *See id.*

Defendant counters that it is not liable under the HCCA because (1) Plaintiffs' complaint was not timely; (2) the work was performed on a building used for commercial purposes, not a residence; and (3) the value of the work on the accessory apartment did not reach the $3,000 threshold. Each of these arguments fails.

Defendant contends Plaintiffs' HCCA claim is barred by 10 M.R.S.A. § 1490(2), which states: "No action may be brought for a civil violation under this subsection more than 2 years after the date of the occurrence of the violation." This limitations period is inapplicable to the present suit. This subsection of the HCCA refers to an action to recover a civil penalty. *See id.* ("Each violation of this chapter constitutes a civil violation for which a forfeiture of not less than $100 nor more than $1000 may be adjudged."). A suit for a civil violation must be brought by the Attorney General or other appropriate official. *Legere Builders, Inc. v. Bonetti*, No. CV-96-

248, 1997 Me. Super. LEXIS 187, at *2-3 (June 13, 1997); *see* 17-A M.R.S.A. § 4-B(1); *Cook v. Lisbon Sch. Comm.*, 682 A.2d 672, 680 (Me. 1996). As such, subsection 1490(2) does not apply to a suit brought by a private party, and its limitations period is inapplicable to this HCCA claim.

The Law Court has clearly foreclosed Defendant's argument that work on Plaintiffs' accessory apartment was not subject to the HCCA because the apartment was to be used for commercial purposes. Under the HCCA, a "home construction contract" is "a contract to build, remodel or repair a *residence*...." 10 M.R.S.A. §1486(4) (emphasis added). A "residence" is defined as "a dwelling with 3 or fewer living units and garages;" however, "[b]uildings used for commercial or business purposes are not subject to" the HCCA. *Id.* §1486(5). The Law Court has observed:

> The limitation in the HCCA to three or fewer living units would appear to contemplate that at least some of those living units might be rental units. ... Thus, residences of homeowners that include one or two rental units would qualify as a residence under the plain meaning of the term "residence" as defined in the HCCA.

*Runnells v. Quinn*, 2006 ME 7, ¶ 18, 890 A.2d 713. The work performed on Plaintiffs' home, including the accessory apartment, qualifies as work performed on a residence under the HCCA.

Finally, the work on Plaintiffs' residence exceeded the HCCA's $3,000 threshold. Although this lawsuit has primarily focused on the work done on the accessory apartment, Defendant also performed work on other parts of Plaintiffs' residence. Charges for all of this work were represented on two change orders. The work on all parts of Plaintiffs' residence was initially invoiced at $3,982.00 and later increased by $1,069.00 when the garage insulation was invoiced. The Court finds no reason to sever the agreement to construct the accessory apartment from the agreement to repair other parts of Plaintiffs' house; all of this qualifies as work "to

build, remodel or repair a residence." 10 M.R.S.A. §1486(4). Taken together, all of the work performed on Plaintiffs' residence was done pursuant to an agreement for more than $3,000.

In sum, the Court finds the agreement to perform construction of Plaintiff's residence was subject to the HCCA. Furthermore, although the change orders serve as writings memorializing the agreement, and the change orders were part of a larger written contract to construct a horse arena, neither the change orders nor the horse arena contract are fully compliant with the provisions of 10 M.R.S.A. § 1487. For instance, neither the horse arena contract nor the change orders contain a dispute resolution provision as required by section 1487(8), an addendum pertaining to consumer protection information as required by section 1487(13), or any reference to the Attorney General's website as required by section 1487(14). Additionally, while the statute requires the contract to be executed "prior to any work performance," most of the work performed on Plaintiffs' home was performed prior to the execution of the written contract. *See id.* Thus, the construction work performed on Plaintiffs' residence was done in violation of the HCCA.

Nonetheless, remedies available to Plaintiffs are limited. Plaintiffs have requested the Court impose a civil penalty of $1,000 for each violation of the HCCA. As discussed above, this penalty is only enforceable by the Attorney General or other qualifying representative and may not be pursued by a private plaintiff. As pertaining to a private plaintiff, the HCCA only provides "[a]ny violation of this chapter shall constitute prima facie evidence of a violation of the" UTPA, so Plaintiffs many only seek relief through the UTPA. *See id.* § 1490(1). The applicability of the UTPA to Plaintiffs' claim is discussed below.

*B. Unfair Trade Practices Act*

Section 213(1) of the UTPA provides that a person who purchases services or property primarily for personal, family or household purposes "and thereby suffers any loss of money or property, real or personal, as a result of" a method or practice that violates the UTPA may bring an action for "actual damages, restitution and for such other equitable relief, including an injunction, as the court determines to be necessary and proper." 5 M.R.S. § 213(1). Plaintiffs have not met their burden of proving it more likely than not that they have suffered a loss of money or property as a result of a practice that violates the UTPA.

A successful HCCA claim merely satisfies the plaintiff's burden of production in pursuing a UTPA claim. *O&O Elec. v. Kuan*, No. CV-06-166, 2007 Me. Super. LEXIS 113, at *4 (June 13, 2007). An HCCA violation does not establish an unfair trade practice or even generate a presumption of unfairness. *Id.* Plaintiffs have not established a level of unfairness or deception necessary to constitute a violation of the UTPA. *Cf. Suminski v. Maine Appliance Warehouse,* 602 A.2d 1173, 1174 (Me. 1992) (although failure to honor statutory warranty may be evidence of UTPA violation, conduct must also be unfair or deceptive to trigger UTPA).

Further, Plaintiffs have not proven that any of their claimed damages result from Defendant's HCCA violation. In order to recover damages for a violation of the UTPA, the homeowner must show a loss of money or property that *results from* the violation. 5 M.R.S.A. § 213(1). Here, the record does not establish that any violation of the HCCA caused Plaintiffs to lose money or property. Plaintiffs have not demonstrated how the lack of necessary permits or the subsequent need for further electrical work arose from Defendant's failure to use a written contract in compliance with the HCCA. The HCCA violation itself is not a proximate cause of Plaintiffs' claimed damages.[2] Plaintiffs have not properly supported their UTPA claim and

therefore are not entitled to the damages they seek.

### C. Fraudulent misrepresentation or fraudulent concealment

Plaintiffs' complaint also alleges a claim for fraudulent misrepresentation or, in the alternative, fraudulent concealment. A claim of fraudulent misrepresentation requires a plaintiff to prove:

> (1) that the defendant made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purpose of inducing the plaintiff to act in reliance upon it, and, (5) the plaintiff justifiably relied upon the representation as true and acted upon it to the plaintiff's damage.

*In re Boardman*, 2017 ME 131, ¶ 9, 166 A.3d 106 (quoting *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 9, 832 A.2d 771. The elements of fraudulent concealment are: "'(1) a failure to disclose; (2) a material fact; (3) where a legal or equitable duty to disclose exists; (4) with the intention of inducing another to act or to refrain from acting in reliance on the non-disclosure; and (5) which is in fact relied upon to the aggrieved party's detriment.'" *Id.* (quoting *Picher v. Roman Catholic Bishop of Portland*, 2009 ME 76, ¶ 30, 974 A.2d 286). Fraudulent misrepresentation and fraudulent concealment must be proven by clear and convincing evidence. *Picher v. Roman Catholic Bishop of Portland*, 2013 ME 99, ¶ 2, 82 A.3d 101; *Me. Eye Care Assocs., P.A. v. Gorman*, 2006 ME 15, ¶ 16, 890 A.2d 707.

Plaintiffs have not proven these claims by clear and convincing evidence. In particular, as to fraudulent misrepresentation, Plaintiffs have not pointed to the exact material fact that was misrepresented. Moreover, to the extent the material fact is that no permit was obtained, the record contains no evidence that Defendant ever represented to Plaintiffs that a permit had been obtained. Defendant only told Plaintiffs he was in the process of obtaining the permit by

---

[2] Plaintiffs' complaint also alleges Defendant breached express and implied warranties and thereby violated the UTPA. However, Plaintiffs have not presented any evidence or meaningful argument as to the existence or breach of a warranty. Thus, Plaintiffs have not supported a warranty-based UTPA claim.

submitting the application and communicating with Town of Windham representatives. Ample evidence exists that these statements were not misrepresentations and that Defendant made no other misrepresentations. As to both claims, Plaintiffs have neither proven that Defendant intended to induce Plaintiffs to act or refrain from acting or that Plaintiffs actually relied upon any misrepresentation or non-disclosure by Defendant. Because these claims require clear and convincing evidence of intent and reliance, and Plaintiffs have not presented such evidence, these claims must fail.

IV. Conclusion

For the foregoing reasons, judgment is entered for Defendant Landmarc Construction Services LLC. Each party is to bear its own costs and attorney's fees.

The Clerk is directed to incorporate this Judgment into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: 4/3/18

Lance E. Walker, Justice
Maine Superior Court